IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MAYFLOWER TRANSIT, INC. | : | CIVIL ACTION |
| and LOUDERBACK WORLDWIDE | : | |
| MOVING | : | NO. 02-CV-2702 |
| Plaintiffs | : | |
| | : | |
| vs. | : | |
| | : | |
| HOUSEHOLD MOVERS SERVICES | : | |
| Defendant | : | |

**DEFENDANT HOUSEHOLD MOVERS SERVICES**
**SETTLEMENT CONFERENCE MEMORANDUM**

SETTLEMENT CONFERENCE BEFORE THE HONORABLE FAITH ANGELL SCHEDULED FOR: SEPTEMBER 22, 2003 AT 9:30 A.M.

**FACTS:**

In the Summer of 1995, the University of Pennsylvania, on behalf of their new employee, Richard Tannen, M.D., contracted with Mayflower Moving and Storage/Louderback to move the Tannens' household property from Los Angeles, California to a home in Gladwyne, Pennsylvania. The Tannen property was loaded in Los Angeles in late July of 1995, and they arrived in the Philadelphia area in approximately the first week of August. Prior to the time the move was arranged for the Tannens, Dr. and Mrs. Tannen met several times with representatives of Louderback to make sure that their prized household possessions would be treated properly, and received assurances from

Mayflower/Louderback that since the Tannen home would not yet be ready to receive the moved goods upon arrival in the Philadelphia area, that their property would be stored on the moving trailer itself, **in a climate-controlled facility**, until such time as the home was ready to receive the shipment.  Although Plaintiffs dispute making any such promise, Dr. and Mrs. Tannen will testify to this effect.

Eventually, the Tannen goods, which had been stored in the meantime on a Mayflower moving van, were delivered to the Tannen property in Gladwyne, Pennsylvania on or about March 1, 1996.  When the doors to the moving van were opened, Dr. and Mrs. Tannen reported an overwhelming smell of mold and mildew emanating from the interior of the moving van where all of the Tannens' good were packed.  Dr. and Mrs. Tannen, in very short order, rejected this shipment since it was obvious to them that the shipment had been damaged in some way by moisture/mold/mildew/humidity.  Once the shipment was rejected, Dr. and Mrs. Tannen learned for the first time, that after their transported goods arrived by moving van in early August of 1995, from that point forward, their goods remained packed on the same moving van, and their property was never stored in a climate-controlled environment, as promised.  To make matters worse, Dr. and Mrs. Tannen learned, and this was later confirmed by the President of Louderback, that their moving van was actually parked on an outside lot in King of Prussia at

the Mayflower facility during the first few months of 1996, and during the course of the "Blizzard of 1996," which dumped over 35 inches of snow on the ground in the Philadelphia area in February of 1996. The Tannens and the University of Pennsylvania thereafter filed suit in the U.S. District Court for the Eastern District of Pennsylvania alleging negligence on the part of Mayflower/Louderback in the manner in which their goods were transported and stored, alleging damages of over $900,000. Plaintiffs submitted a Proof of Loss in the underlying case in the amount of approximately $803,255. Plaintiffs' damages were comprised of a claim for damages to highly valued and antiqued property and damage to this type of property in the amount of $487,673, $250,000 for claimed lost profits for Mrs. Tannen's interior design business adversely affected by the inability to use her furnishings, approximately $76,100 representing contract costs expended by the University of Pennsylvania, as well as some $23,000 for damages to a Land Rover vehicle. Not too long after Gary Louderback gave a deposition in which he expressed his shock and dismay at learning for the first time recently that the Tannens' good had actually been stored on a trailer on an outside lot at the Mayflower facility in King of Prussia, contrary to his promises to the Plaintiffs, the underlying case suddenly settled for the sum of approximately $428,500.

The underlying claim of the Trustees of the University of Pennsylvania and Dr. Richard L. Tannen, M.D. and his wife filed against Mayflower/Louderback was eventually settled on or about October 30, 1997.  In the early days of March 1996, when the shipment in question was rejected by the Tannens, and Mayflower discovered the presence of moisture/mildew, etc. in the packed Tannen trailer, Mayflower's own management suspected that a cause of the moisture inside the truck was green wood being used in the construction of the moving crates which were used to package the more valuable parts of the Tannen antique furnishings. **As early as June 18, 1996, or earlier**, an independent insurance adjuster named Joseph Conte wrote to St. Paul Insurance Company (Mayflower's insurance carrier) referencing the fact that a company named Household Movers Services (Defendant in the instant action) "apparently used green lumber, which lead to the mildew situation."  Moreover, the former Claims Manager of Mayflower/Louderback Claims Department in King of Prussia in 1995, recently gave a deposition and testified that she first learned of a problem related to the Tannen shipment as early as 1995, and she stated that she was advised by the President of Mayflower/Louderback at that time, that the damaged shipment was caused by wooden crates manufactured from green wood.  Ms. Carberry testified that she learned of this theory of the source of the moisture from her supervisor

4

within the first few weeks of March in 1996, after the shipment was refused. Despite Mayflower/Louderback's suspicions concerning Household Movers Services as a potential source of the moisture which manifested itself inside the Tannen moving van trailer, neither Mayflower nor Louderback or their insurance carrier, took any steps to pursue any claim or cause of action against Household Movers Services at that time. Instead, Mayflower/Louderback, or their insurance carrier, more properly St. Paul Insurance Company, did not even commence the instant law suit against Household until May of 2002, more than six years after St. Paul/Mayflower/Louderback first became aware of a possible claim over against Household Movers Services for allegedly supplying wooden crates constructed from green lumber. **As an aside, Defendant Household has filed a Motion for Summary Judgment with this Honorable Court based on a statute of limitations defense, which Motion is currently pending.**

**LIABILITY:**

Plaintiffs/Mayflower, who actually were defendants in the underlying action, are continuing to use an expert report from Thomas Kuhns, Jr. dated 5/14/96 in the instant action. Mr. Kuhns, a certified furniture restorer, states that while he agreed with the owners (the Tannens) that there was some evidence of

visible mildew growth and odor, Mr. Kuhns disagreed that **all** of the furniture items had been directly or indirectly affected by the mildew growth or odor.  On many of the art work pieces, Mr. Kuhns could not detect any direct or indirect mildew contamination, something which directly contradicts the conclusions of Mayflower's environmental expert, Dr. Herman Levin.  Although Mr. Kuhns opines that the wooden crates were, in fact, constructed from wet lumber, resulting in direct mildew growth and odor on these crates and the residual odor and contamination of other items in the shipment, Mr. Kuhns further states that this is **"not to say that they were made from green wood."**  The mildew growth and damage level on the crates and cardboard liners was too severe for the damage to have been simply caused by green wood in the opinion of Plaintiff's expert Kuhns.  By virtue of this admission from the Plaintiff's own expert, it is clear that there was an external source of water damage in the trailer in question, especially given the trailer's extended exposure to the elements and humidity extremes of January/February weather in the Philadelphia/King of Prussia area through the Blizzard of 1996, when the subject trailer, for some unknown reason, was simply left parked outside on a Louderback parking lot.

     Plaintiff's environmental expert, Herman W. Levin, Ph.D., in his report of 6/3/97 states that he found spots on the Plaintiffs' furniture which seemed to be

due to **"old fungal growth,"** which indicates mold which pre-dated his inspection, and arguably pre-dated this move.  Dr. Levin admitted that some of the cushions and pillows from the shipped Tannen furniture, contained on the trailer in question, had a very high fungal contamination **before ever being removed from the Tannen residence** in California in the first place.

    Plaintiffs have supplied no expert report to show that the wooden crating material in question was ever inspected in any way by Mayflower/Louderback at the point of origin when the shipment was originally loaded in late July of 1995. If the lumber was truly green as alleged, Plaintiff professional moving company surely should have been in a position to notice this claimed condition of the lumber and should not have used it.

    Gary Louderback, the President of Louderback Moving and Storage, testified that he believed that the movement of the trailer in question to an outside lot during the extreme weather conditions during the Blizzard of 1996, had a significant cause and effect on the amount of humidity/moisture inside the trailer in question, since he believed that it created a "greenhouse effect" inside the trailer.  Earl Eberwein, a former furniture refinisher for Mayflower/Louderback, who has worked in the wood finishing business for more than 20 years, has testified that any theory that the alleged green wood was the source of all of the

moisture/mildew/mold inside the subject trailer seems far-fetched.  Mr. Eberwein, who has specific experience with green wood, actually observed the wooden crates after the entire load had been rejected, and he does not believe the crates were made from green wood.  In addition, Earl Eberwein has testified that shortly after the shipment was rejected, **he overheard Joanne Carberry and her superior, George Smith from Mayflower, discuss some type of hole in the top of the subject trailer, which actually leaked external water into the interior of the trailer**.  Joanne Carberry, while not specifically remembering this conversation, nonetheless made the statement according to Earl Eberwein, and qualifies as an exception to the hearsay rule as an admission by a party opponent, since at the time the statement was made, Joanne Carberry was the Claims Supervisor for Louderback Moving and Storage.

    Robert Marcy of Movers Specialty Services, the company Mayflower hired to unpack and catalog the damaged shipment, testified that he actually observed direct evidence of water damage on at least one cardboard box and also found evidence of moisture/dampness inside a framed picture, which was not an item shipped inside one of the wooden crates at issue.  As to the issue of the crates, although some 43 wooden crates were allegedly provided by Household Movers Services for this move occurring in late 1995, by the time Plaintiffs in the instant

action made available to Defendants any pieces of the wooden crates in question in March of 2003, the only wooden crating materials still available for inspection or testing were portions of approximately six wooden crates, with the remainder of the crates having been spoliated or merely discarded by the Plaintiffs.

Given the inconsistencies and the conclusions drawn by Mayflower's own experts, liability is greatly at issue. Mayflower/Louderback used the same liability experts in defending the underlying claim brought by the University of Pennsylvania and Dr. Richard Tannen and his wife, as in the instant case, so necessarily, these experts challenged both the liability and the damages claimed by the Tannens in that law suit. Now, of course, the instant case involves the subrogation action brought on behalf of St. Paul Insurance Company, the carrier for Mayflower, but Mayflower has continued to use the same two liability experts, whose conflicting conclusions in their defense of the underlying case do not necessarily meet the burden of proof to establish liability in the instant case.

**DAMAGES:**

Plaintiff's counsel has represented that the underlying case was settled for the sum of $428,500. Approximately 20% of the underlying settlement figure, or approximately $85,000, represents subrogation interests of Louderback Moving

and Storage, whom have expressly disavowed any interest in this litigation, therefore Plaintiff's damage must be immediately reduced by approximately $85,000. Plaintiff's counsel has also admitted that Defendants in the instant action are not responsible for damages to the Range Rover vehicle, which results in another reduction of approximately $15,000 in the amount claimed by the Plaintiff's in this action. Plaintiffs additionally claimed lost profits for Mrs. Tannen's interior design business as a result of the damaged furnishings. Defendants have retained the services of Howard Silverstone, CFE, CPA, who in his report dated 8/8/03 concludes that the business loss claimed by Mrs. Tannen is completely speculative and without any basis whatsoever. Therefore, any amount of damages based upon lost profits should be subtracted completely from the Plaintiff's claim. Mr. Silverstone further concludes that he was only able to find documentation for approximately $83,000 of property specifically damaged which was actually shipped in wooden crates.

**Plaintiffs do not have an expert economist** who will testify on the lost profits claim of Mrs. Tannen, therefore Howard Silverstone's conclusions concerning the lost profits claim will be unchallenged at Trial.

Given the fact that Plaintiffs settled the underlying case for $428,500, after reductions for the Louderback portion not being pursued ($85,000) and the

$15,000 for damage to the vehicle, and reductions for the Plaintiff's lost profit claim ($142,453), the most Plaintiffs can claim as damages, without respect to liability is only approximately $186,047. Arguably Mayflower/Louderback themselves contributed to the moisture problems found inside the shipped trailer, by their own affirmative negligence in carelessly leaving this trailer parked outside through the Blizzard of 1996, and provides the basis for an argument that Plaintiff's damages need to be reduced even further for their own comparative negligence.

**DEMAND:**

Plaintiff's first demand, as of September 2003, is $250,000.

Offers: None.

**ESTIMATED TIME FOR TRIAL:**

Approximately two full trial weeks.

**COMMENTS:**

Both parties are involved in discussion as to the possibility of resolving this case by means of a binding high/low arbitration. At this point, only Plaintiffs have

agreed to this form of ADR, and Defendant's insurance carrier is currently considering this option.

                                Respectfully submitted,

                                **DEASEY, MAHONEY & BENDER, LTD.**

                          BY:_____
                                JOHN M. DONAHUE, ESQUIRE
                                Attorney for Defendant, Household Movers Services
                                Identification No. 27268
                                1800 John F. Kennedy Boulevard
                                Suite 1300
                                Philadelphia, Pa 19103-2978
                                (215) 587-9400/ (215) 587-9456 fax